IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JOSEY R. EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:19cv00765 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| J. RENALDS, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff Josey R. Edwards, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983, claiming that the defendants, Amherst County Deputies Juette Renalds and Brandon Hurt (collectively "Defendants"), used excessive force against him— and that Hurt acted with gross negligence—during a traffic stop in Lynchburg, Virginia. The matter is currently before the court on Defendants' Motion for Summary Judgment (ECF No. 86). After review of the record, the court concludes that Defendants' motion must be granted.

## I.   BACKGROUND

### A.   Edwards's Version of Events[1]

On January 16, 2018, Edwards and two friends, Angelina Brooks and Bruce Sandige, drove to a friend's Lynchburg residence. Brooks was driving, Edwards was in the front passenger seat, and Sandige was in the backseat. When they arrived at the friend's home, which was located on a narrow, two-way street with cars parked on both sides, Brooks parked the

---

[1] This summary is taken from Edwards's submissions describing events relevant to his claims (ECF Nos. 1, 69, 107, 114, and 118), only some of which are signed under penalty of perjury. The court has combined and summarized Edwards's accounts in the light most favorable to him.

car and they waited for their friend. A car approached from the opposite direction and parked ten yards away on the other side of the street. A man—now identified as Lynchburg Police Officer S. C. Reed—walked to the driver's side window and blinked a flashlight. Edwards claims Reed did not identify himself as a police officer and that no one at the scene activated police lights. (ECF No. 107, ¶ 3.) Brooks rolled down the window. Reed asked, "Angelina Brooks [or] Josey Edwards?" (ECF No. 69, at ¶ 5.) Brooks answered yes, and Reed told her that she was under arrest. Brooks got out of the car, but left it running. (ECF No. 107, at ¶ 4.)

Edwards heard someone tell him "to get out of the car, but also to keep his hands on the dashboard." (ECF No. 107, at ¶ 5.) The front passenger door had been sticking in the locked position and required some tinkering to get the door open. When Edwards was trying to exit the car, a "Lynchburg Officer" identified as D. L. Crouch asked Edwards what was in his hand and told him to put it in the cupholder and place his hands on the dashboard. (ECF No. 69, at ¶ 9.) Edwards complied. He states that he "didn't know who this was, and [he] thought [he] may be being robbed." (ECF No. 107-1, at ¶ 5.) "An officer" then tried to open the front passenger door, unsuccessfully, and instead opened the rear passenger door, saying "step out of the car or exit the car, something of that nature." (ECF No. 69, at ¶ 10.) Edwards decided to exit through the driver's side door. As he slid over to that side of the vehicle, he "inadvertently hit the gas pedal"; the engine "revved, but the vehicle stayed in park position." (ECF No. 107, at ¶ 7.)

Once Edwards was in the driver's seat, he claims Renalds ran up to the driver's side of the car and struck him two times in the left side of his face with a firearm, cracking four of his teeth, shattering two of them, and leaving a large gash under his left eye. (ECF No. 107, at

¶ 8.) Edwards denies that Renalds gave him any warning before striking him in the face. (ECF No. 69, at ¶ 15.) Edwards states that he "went into survivor mode and drove away as the car was already running." (ECF No. 107-1, at ¶ 11.) He states that no one was in the path of the car; "everyone was at the sides or rear of the vehicle." (ECF No. 69, at ¶ 16.)

As Edwards drove away, a dark pickup truck was parked to block the street. Edwards saw enough room to maneuver behind the truck and tried to do so. The driver of the truck, identified as Deputy Hurt, drove backward and crashed into Edwards's car, causing a "small amount of scraping." (ECF No. 69, at ¶ 19.) Edwards was, nevertheless, able to drive away from the scene. X-rays later showed that two of Edwards' teeth "had been broken off at the gum line," and medical professionals removed them. (ECF No. 69, at ¶¶ 42–43.)

## B.     Defendants' Version of Events[2]

Beginning in August and September of 2017, Amherst County Sheriff's Deputies Renalds and Hurt investigated individuals engaged in a conspiracy to distribute heroin and fentanyl in the Lynchburg and Amherst County areas. They suspected that Edwards was part of the conspiracy. Renalds oversaw several controlled purchases of heroin by confidential informants from Edwards.

On January 16, 2018, Renalds and Hurt were conducting surveillance in Lynchburg as part of the investigation into Edwards's drug trafficking. At about 9:10 p.m., Renalds and Hurt

---

[2] This summary of facts is based on the defendants' evidence submitted in support of their motion for summary judgment (ECF No. 86): Ex. A ("Renalds's Decl.") (ECF No. 87-1); Ex. B ("Hurt Decl.") (ECF No. 87-2); Ex. C ("Reed Decl.") (ECF No. 87-3); Ex. D (screen capture photo of Renalds). The defendants have also submitted relevant video footage of the incident from body cameras worn by Reed and Crouch (Ex. C, Attach. 1 and 2). They have also offered an affidavit authenticating this footage as recordings from the evening of January 16, 2018 ("Davis Decl." and Attach. 1 [ECF No. 110-1]) and screen shots from that video footage (Ex. F, G, H, and I [ECF Nos. 110-2, 110-3, 110-4, 110-5]). The court's account includes references to the video footage using the camera officer's name and the approximate timestamp on the footage (i.e., "Reed 02:30").

watched while Lynchburg Police Officer Reed, assisted by Officer Crouch in a separate vehicle, initiated a traffic stop of a parked Kia sedan involving Brooks, Edwards, and Sandige. Reed had information that authorities had outstanding felony warrants for Brooks and Edwards. He also learned that driver's licenses for both Brooks and Edwards had been revoked. The deputies also "suspected that Edwards was in possession of heroin for distribution." (Renalds Decl. ¶ 8.)

Reed parked his police cruiser on the opposite side of the street and walked, in uniform, over to the Kia sedan, and Officer Couch drove up behind the sedan and activated his vehicle emergency lights. (Couch 01:09.) Renalds observed the traffic stop from behind the Kia sedan. Hurt, driving an unmarked, sheriff's office pickup truck, parked his vehicle facing the Kia sedan to watch the proceedings and assist if needed.

Reed, in uniform, verbally identified himself as a police officer and asked the driver to turn off her vehicle. (Couch 00:10.) Brooks agreed and shut off the engine (Reed 00:17). Reed then told Brooks she was under arrest for an outstanding warrant for grand larceny, and she got out of the car. Meanwhile, Couch kept watch on Edwards and Sandige from the other side of the car. Clearly audible on both the videos, Reed and Couch several times ordered Edwards in the front passenger seat to keep his hands visible, on the dashboard of the car. They did not order Edwards or Sandige to get out of the sedan.

As Reed was handcuffing Brooks, he saw Edwards reach between his legs with his right hand and retrieve a plastic baggie with an off-white substance in it. Reed told Edwards to drop whatever was in his hands and keep his hands on the dashboard. Instead, Edwards reached between his legs again. He then held out his left hand, saying, "It's my money." (Reed 02:15.)

Reed walked Brooks around the back of the vehicle and went to remove Edwards from the car. As Reed came up to the passenger side front door, he saw Edwards reaching under the driver's seat and floorboard area. Reed drew his gun and ordered Edwards to "stop reaching around, but [Edwards] did not comply." (Reed Decl. ¶ 21.) Edwards, still sitting in the passenger seat, reached over and started the sedan's engine. (Reed 02:41; Couch 02:26.) He then moved into the driver's seat. Reed started moving toward the front of the car, intending to contact Edwards at the driver's side door. He placed his hand on the car's hood near the passenger side headlight and ordered Edwards again to stop reaching around. (Reed 02:44.) Around this same time, Sandige climbed out of the car on the back passenger side, without incident. (Couch 2:28.)

When Hurt saw Edwards move into the driver's seat after starting the engine, Hurt "tried to maneuver [his] vehicle so that it was facing the opposite direction," ready to pursue Edwards. (Hurt Decl. ¶ 12.) Other parked cars interfered with this strategy, so Hurt "parked [his truck] perpendicular to Edwards'[s] vehicle with the goal of blocking Edwards from escaping. [Hurt] then shifted [his] vehicle into park." (Hurt Decl. ¶ 14.) When Edwards hit the accelerator in the sedan, Reed "had to jump out of the way in order to avoid being hit." (Reed Decl. ¶ 22.)

When Renalds heard Edwards start the car, he ran forward to the driver's side door, yelling, "Stop! Police!" (Renalds Decl. ¶ 20; *see also* Couch 02:30.) At the same time, Renalds saw Reed moving toward the front of Edwards's vehicle. Renalds feared that Reed "could possibly be run over and potentially dragged by Edwards'[s] vehicle or crushed between Edwards'[s] vehicle and the parked vehicles on the street, so [he] decided to take action to

stop Edwards from driving away from the scene and potentially killing or injuring Officer Reed." (Renalds Decl. ¶ 23.) Because Renalds was in plain clothes that night, he did not have his taser or baton, but he did not feel the circumstances warranted use of his firearm. Instead, Renalds ran to the driver's window and "struck Edwards in the face one time with the light mounted below the barrel of [his] sidearm in order to stop him from driving away." (Renalds Decl. ¶ 25.) "Edwards did not cry out in pain and did not appear to be stunned from the blow because he immediately accelerated away from the scene." (Renalds Decl. ¶ 26.)

"As Edwards drove away from the scene, he struck the rear of [Hurt's] vehicle and then drove up on the curb and around [Hurt's] vehicle in order to escape" down the street. (Hurt Decl. ¶ 15.) Hurt states that he "did not attempt to stop Edwards by placing [his] vehicle in reverse and hitting [Edwards's] vehicle." (Hurt Decl. ¶ 16.) The officers did not follow Edwards.[3]

Edwards brought suit in this court on November 15, 2019, alleging a plethora of federal and state causes of action against numerous defendants and entities. Edwards's claims have been whittled down to claims of excessive force against Renalds and Hurt and a claim of gross negligence against Hurt. (*See* Mem. Op. pg. 1, Mar. 30, 2021 [ECF No. 76].) Renalds and Hurt have filed a motion for summary judgment, arguing that their actions did not violate the Fourth Amendment, or in the alternative, that they are entitled to qualified immunity. Edwards, who has reviewed Defendants' evidence (including the video footage in the record), has responded, making Defendants' motion ripe for consideration.

---

[3] Video footage is inconclusive as to whether Hurt's vehicle was moving when Edwards' struck it and drove away. (*See* Couch 02:38.)

## II.   <u>Standard of Review</u>

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment, Edwards must present sufficient evidence that could carry the burden of proof of his claims at trial. *See id.* at 252. He "must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his favor. *Id.* at 248.

The court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).[4] A pro se litigant's verified complaint or other verified submissions must be considered as affidavits and may defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991). But when "the record contains an unchallenged videotape capturing the events in question, [the court] must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape." *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

---

[4]  The court has omitted internal quotation marks, alterations, and/or citations here and throughout this opinion, unless otherwise noted.

### III.   <u>Analysis</u>

*A. Qualified Immunity*

Police officers are entitled to immunity against claims for monetary damages when they commit constitutional violations, but reasonably believe that their actions were lawful in the light of clearly established law. *See Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). A court must conduct a two-prong inquiry to decide a defendant's claim of qualified immunity. First, the court considers whether a constitutional violation occurred. *Id.* at 531. Second, the court considers whether the right violated was clearly established at the time of the violation. *Id.*

An officer's use of force on arrest is considered under the Fourth Amendment and does not violate the Constitution if it is objectively reasonable in light of the facts and circumstances. *Graham v. Connor*, 490 U.S. 386, 388 (1989). This analysis requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. Three non-exclusive factors guide the court's objective reasonableness inquiry: (1) "the severity of the crime at issue"; (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others"; and (3) whether the suspect was resisting arrest or attempting to flee. *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Importantly, the court must judge the defendant's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The court's reasonableness assessment must make "allowance for the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397.

When events surrounding uses of force occur in a matter of seconds, as in this case, the court cannot expect police officers to interpret the situation perfectly or react perfectly to it. Rather, officers are entitled to qualified immunity against suits for damages if a reasonable officer facing the same situation would not have known that his actions violated the plaintiff's clearly established constitutional right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see, e.g., Anderson v. Russell*, 247 F.3d 125, 129–32 (4th Cir. 2001) (finding officers entitled to qualified immunity after shooting unarmed suspect, because officers reasonably believed that suspect might have been reaching for a weapon). Because the Fourth Amendment standard and the qualified immunity analysis correlate so closely in this case, the court will begin its analysis by determining whether the Defendants violated Edwards's constitutional rights.

The parties have different understandings of what was happening on January 16, 2018. Normally, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Rather, when the plaintiff's "version of events is so utterly discredited by the record that no reasonable jury could have believed him," the court should "view[ ] the facts in the light depicted by the videotape." *Id.* at 380–81.

Edwards's version of events is belied by the video depicting those events. To put it bluntly, virtually every one of his factual assertions is demonstrably false. Accordingly, the court concludes that no reasonable juror could believe Edwards's version of events so as to find that the Defendants used unreasonable force against him in light of the circumstances they faced.

For the court to rely on the video version of the facts, that footage cannot be in dispute. *See, e.g., Iko*, 535 F.3d at 230. Initially, after Edwards viewed the video footage from the body cameras that Reed and Couch were wearing that night, he complained vaguely that it had been "altered and manufactured," because the date stamp read January 17, 2018, the day after the events depicted. (ECF No. 107, at ¶ 2.) But the record now includes the declaration of Daniel Davis, the Information Technology Manager for the Lynchburg Police Department, explaining this discrepancy. The Axon body cameras Reed and Couch wore capture and timestamp video footage in Coordinated Universal Time, a 24-hour format also known as Zulu time. Davis states that Zulu time is five hours ahead of Eastern Standard Time, but that "[t]he metadata for the video file shows the local time zone of the video recording." (Davis Decl. ¶ 7.) Davis also presented evidence showing that, even though the date stamp on Reed's body camera footage indicates "2018-01-17," the metadata for that footage clearly states that the footage was recorded just after 9:00 p.m. on January 16, 2018. (Davis Decl. Attach. 1.) Edwards has not offered any evidence contradicting this information about the date stamps or the metadata on the video footage. In fact, Edwards has relied on the footage as supporting his contention that Reed was not in front of Edwards's vehicle as he drove away that night.

- 10 -

Thus, the court finds no genuine issue of fact in dispute regarding the authenticity of the video footage filmed by body cameras worn by Reed and Couch.

B. *Video Evidence Thoroughly Discredits Edwards' Version of Events*

The version of events that Edwards has presented includes these assertions: Reed and Couch did not identify themselves as a law enforcement officers and Edwards thought someone might be trying to rob him; no one activated police car warning lights at the scene; Edwards was confused about what to do after Reed or Couch told him to get out of the vehicle, but also to keep his hands on the dashboard; Edwards moved into the driver's seat to be near a car door that would open so that he could comply with orders to exit the car; Edwards accidently hit the gas pedal, revving the still-running engine; after Renalds struck Edwards in the face, Edwards did not know what was happening and drove away to avoid his attacker; Reed was not in front of Edwards's car; and as Edwards drove away, Hurt backed his vehicle into Edwards. (*See generally* ECF Nos. 69, 107, 107-1.) Based on these assertions, Edwards contends that Renalds and Hurt used excessive force against him by striking him in the face without justification or warning (Renalds) and by backing an unmarked truck into his moving car (Hurt).

As noted above, the video footage contradicts Edwards's assertions and, therefore, the court need not accept his statements as true for the qualified-immunity analysis. *Iko*, 535 F.3d at 230. The video clearly shows Reed's police cruiser parked on the side of the street opposite from Edwards's vehicle and depicts Reed in a police uniform talking to Brooks. On the audio from the footage, there is no doubt that Reed introduces himself to Brooks as "Officer Reed," he directs her to turn off the car, she agrees, and the engine noise ceases. (Reed 01:13.) Couch's

vehicle, parked directly behind the Kia, has its warning lights flashing (Couch 00:11; Reed 00:10.). Reed tells Edwards to hang up his phone, and either Edwards or Sandige says clearly, "Cops is here." (Reed 01:08.) At no point in the footage does an officer tell anyone on the passenger side of the car to exit the vehicle. On the contrary, one can hear Couch telling the backseat passenger *repeatedly* to stay where he is. The listener can also hear both Reed and Couch ordering Edwards, numerous times, to keep his hands visible, to keep them on the dashboard, and to stop reaching around. The video depicts Edwards defying these orders numerous times—by reaching down between his legs or to other locations in the car.

The body cam video also shows Edwards starting the Kia's engine. (Couch 02:26; Reed 02:41.) Reed then moves toward the front of the Kia and places his hand on the hood, just above the passenger side headlight. (Reed 02:44.) Renalds then runs from behind the Kia toward the driver's window. (Couch 02:30.) Edwards drives off and contacts Hurt's truck, which is blocking the street; goes around it; and heads on down the street beyond. (Reed 02:52.)

In light of the undisputed video evidence, the court concludes that no reasonable juror could believe Edwards's story that he did not know the individuals around his car that night were law enforcement officers and that he drove away to avoid being struck again. Similarly, no reasonable juror could believe that Hurt drove his truck into Edwards's car with excessive force as Edwards fled the scene or that, if Hurt baked his truck into the fleeing Edwards's car, that the force exceeded constitutional bounds. *See e.g.*, *Garner*, 471 U.S. at 11 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, . . . it is not constitutionally unreasonable to prevent escape by using deadly force."). The court

concludes that the facts simply do not show that the deputies violated Edwards's Fourth Amendment rights in any respect.

### C. The Objective Reasonableness Standard

As noted above, the court's inquiry into the reasonableness of a police officer's use of force weighs three factors—"the severity of the crime"; the "immediate threat to the safety of the officers or others"; and the suspect's attempts to resist arrest or flee. *Graham*, 490 U.S. at 396. Applying these factors, the court finds no material dispute of fact on which Edwards could persuade a jury that Renalds's or Hurt's actions on January 16, 2018, violated Edwards's constitutional rights.

First, these Defendants had extensive evidence that Edwards had been personally involved in distributing heroin in Lynchburg. They also knew that Edwards had outstanding felony warrants and believed that he possessed a distributable quantity of heroin on January 16, 2018. In short, Renalds and Hurt reasonably believed that Edwards had committed, or was committing, a serious drug-trafficking offense or had previously committed another severe criminal offense for which he could be arrested, satisfying the first *Graham* factor.

Defendants also reasonably believed that Edwards posed an immediate threat to the safety of officers or others that night, and/or that he sought to evade arrest. Edwards repeatedly defied orders to keep his hands visible. He restarted the car's engine and moved to the driver's seat. Hurt reasonably perceived these actions as Edwards's preparation to flee the scene and moved his truck to block the street. Renalds reasonably perceived that just as Edwards started the engine, Reed was heading toward the front of the vehicle and would be in the car's path if Edwards drove away. Reed jumped away to safety. That fact, however, does

not affect the reasonableness of Renalds's perception that Edwards posed an immediate threat to Reed's safety.

In response to the threat and impending escape that Renalds perceived, he took action. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11. Indeed, Edwards contends that if Renalds had actually believed that Reed or others would be harmed, he would have fired his weapon and his failure to do so proves that he acted unreasonably, out of personal rage rather than in response to any real risk to Reed or others.

The court finds no merit—or even logic—in this argument. Rather, the indisputable evidence is that in the seconds leading up to Edwards's hasty exit from the scene, Renalds reasonably feared a scenario in which Edwards intended to escape in the vehicle. If he did so, he could injure or kill Reed, who was standing at the front right side of the car. While Edwards ultimately directed the vehicle to the left, avoiding striking Reed as he stood to the right of the car, this fact has no bearing on the court's finding that Renalds, at the time he struck Edwards, reasonably perceived, and acted to alleviate, an immediate threat of harm to Reed. Thus, the court is satisfied that Renalds's use of force, whether one blow or two to Edwards's face, can only be characterized as a reasonable response to the perceived risks. No one violated Edwards's constitutional rights.

Edwards has also utterly failed to show that Hurt's use of his truck that night constituted excessive force under the Fourth Amendment. Hurt knew that Edwards had been, or was, involved in serious criminal offenses. Further, Hurt reasonably perceived from

- 14 -

Edwards's actions that he was trying to avoid arrest and potentially escape. As the video clearly depicts, when Edwards started the sedan and moved to the driver's seat, Hurt's response was to park his truck as a partial roadblock to discourage escape. The video also contradicts Edwards' statement that as he drove away, Hurt purposely backed into him. Under the *Graham* factors, the court is satisfied that Hurt's use of force (moving his truck into Edwards' path before Edwards drove past him, or even backing a few feet into Edwards's fleeing car) can only be characterized as a reasonable response to the perceived risks that did not violate Edwards's constitutional rights. Thus, both Renalds and Hurt are entitled to qualified immunity against Edwards's claims for monetary damages.[5] *See Henry*, 652 F.3d at 532.

### D.  *Gross Negligence*

Last but not least, Edwards brings a gross negligence claim against Hurt. Under Virginia law, gross negligence "is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other persons." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016). It "requires a degree of negligence that would shock fair-minded persons." *Id.* The presence of mitigating factors may preclude a finding of

---

[5]  Because Renalds and Hurt satisfy the first prong of the qualified immunity standard, the court need not address the second prong—whether the asserted constitutional right was clearly established. There is a longstanding constitutional right to be free from unreasonable seizures, including the right to be free of seizures effected by excessive force. *Graham*, 490 U.S. at 388. In two recent decisions, however, the Supreme Court reversed denials of qualified immunity because the case law offered as demonstrating "clearly established" law presented insufficiently similar factual circumstances. *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam); *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam). The burden of proving clearly established law in a non-obvious case lies with the plaintiff. *See Bond*, 142 S. Ct. at 12 (faulting the respondent—the plaintiff below—for failing to identify "a single precedent finding a Fourth Amendment violation under similar circumstances") Edwards has not presented a case holding that use of a physical blow (not involving firearms) to alleviate a reasonably perceived potential danger to others constituted excessive force. *See, e.g., Gambrel v. Knox Cnty., Kentucky*, 25 F.4th 391, 401–02 (6th Cir. 2022) (granting qualified immunity to officers who physically struck plaintiff to rescue his kidnapped daughter from him as he was carrying her on a dark, busy highway and refused to stop or release her to authorities).

gross negligence. *Davis v. DeWilde*, No. 1:21CV00009, 2021 WL 3113505, at *2 (W.D. Va. July 21, 2021) (collecting cases). In other words, "the standard for gross negligence in Virginia is very high." *Doe v. Russell Cnty. Sch. Bd.*, 292 F. Supp. 3d 690, 716 (W.D. Va. 2018).

Hurt was not grossly negligent here. After Edwards restarted the Kia, Hurt tried to move his unmarked truck "so that is was facing the [same direction as the Kia] in the event [he] needed to pursue Edwards." (Hurt Decl. ¶ 12.) Other parked vehicles made this impossible, so Hurt moved his truck to be perpendicular to Edwards's car. (Hurt Decl. ¶¶ 13, 14.) As Edwards fled the scene, he contacted the back of Hurt's truck. (Hurt Decl. ¶ 15.) Hurt did not pursue Edwards. (Hurt Decl. ¶ 16.) Further, the combination of the ongoing arrests and Edwards's attempted flight from law enforcement is a mitigating circumstance which precludes a finding gross negligence. *Davis*, 2021 WL 3113505, at *2.

The video evidence corroborating Hurt's sworn declaration makes this a case where "persons of reasonable minds could not differ upon the conclusion that such negligence has not been established," and "it is the court's duty to so rule." *Elliott*, 791 S.E.2d at 622. Hurt's conduct did not lack the "absence of slight diligence, or the want of even scant care" that gross negligence requires. *Id.* As a result, the court will grant Hurt's motion for summary judgment.

## IV.   CONCLUSION

Accordingly, the court concludes that Defendants are entitled to qualified immunity on Edwards's claims of excessive force under the Fourth Amendment. Therefore, the court will grant the Defendants' Motion for Summary Judgment on that ground as to the § 1983 claims. Furthermore, for the reasons stated, the court will grant Hurt's Motion for Summary Judgment on Edward's gross negligence claim against him.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to the parties.

**ENTERED** this 23rd day of March, 2022.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE